IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| v. | * | Criminal No. CCB 20-319 |
| **BRANDON GOFORTH** | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

### REPLY IN SUPPORT OF MOTION TO REOPEN DETENTION HEARING AND TO ORDER TEMPORARY PRETRIAL RELEASE

The shocking number of positive cases at CDF forces the government to acknowledge the obvious fact that there is a serious outbreak of COVID-19 at the facility. Yet because it continues to defer uncritically to reports and assurances from jail officials about conditions there, the government fails to recognize that the outbreak could have been prevented and that the jail is unequipped to provide appropriate care to the inmate population during this crisis. By last count approximately 197 of 386 detainees had tested positive. These numbers alone demonstrate that the facility has completely failed in its duty to keep the inmate population safe and that its assurances should be viewed with great skepticism. Mr. Goforth contracted COVID-19 because the jail did not have rudimentary protections in place so that the virus would not spread within its walls. Once he was infected, little effort has been undertaken to monitor his symptoms or prevent his asthma from flaring up. He continues to experience symptoms and was only provided a new asthma inhaler a few days ago after weeks of repeated entreaties to medical staff. The defense has proposed a release plan that addresses all concerns about danger raised by the government. Mr. Goforth should be released to his mother's home until he can be safe at CDF. If the Court is not inclined to release Mr. Goforth on the current record, it must order an independent site inspection

of CDF by a prison health specialist who can give an unbiased report about conditions within the facility and provide guidance to the facility about how to address this crisis.

The government's opposition brief fails to establish that the defense proposal, namely that Mr. Goforth be placed on home confinement at the home of his mother, would not assure the safety of the community. Mr. Goforth would be on lockdown with an electronic monitor. Under those strict conditions, it cannot be said that there is a significant danger concern. This is particularly true given that Mr. Goforth has a demonstrated record of compliance with conditions of court supervision for three full years ending in 2017.[1]

**I.      If the Court is Not Inclined to Release Mr. Goforth Immediately, the Court Should Order a Site Inspection of CDF.**

In its efforts to convince this Court that Mr. Goforth is safe at CDF, the government relies on a two-page memorandum written almost a month ago that lists a handful of reactionary steps that CDF purportedly has taken in response to the current outbreak. U.S. Oppo., Ex. A. If anything, the fact that these protocols were not in place before this outbreak shows how derelict the institution has been in its duty to protect inmates and staff. They include cleaning rooms used for court and attorney visits—which numerous detainees cycle through each day—in between uses. How is it possible that such cleaning was not happening before? They include testing inmates in quarantine, restrictions on movement, and protocols for PPE—all rudimentary precautions that, 11 months into this pandemic, should have been implemented already. The document also provides

---

[1] In its brief the government states that Mr. Goforth was sentenced to 25 years of incarceration with 7 years suspended in 2011 for a first-degree assault conviction. U.S. Oppo., p. 3. This misstates the sentence. 18 years of the sentence were suspended, meaning that his actual sentence was 7 years. The same paragraph, because of the way it is worded, appears to suggest that Mr. Goforth was twice found to be in violation of the terms of his probation on that 2011 conviction. In fact, those violations occurred 17 and 18 years ago stemming from a 2002 case.

a perfunctory explanation about how the virus spread in the institution.  It is largely silent about whether staff and work details moved between COVID-positive and other units; whether people on COVID-positive units ever moved to other areas of the jail, including for legal visits; and whether any people were moved from COVID-positive units to other floors.

The government also touts the fact that an epidemiologist from the Maryland Department of Health will work with the Department of Public Safety and Correctional Services "as a direct point of contact and outbreak coordinator." *Id*. at 5.  When this announcement was made a couple of weeks ago, there was cause for some hope that a meaningful investigation would be performed by a public health expert who could advise the jail on critical steps to contain the outbreak.  However, the Federal Public Defender's office was subsequently provided with the following summary from Dr. Qarni, the Maryland Department of Health's epidemiologist:

<span style="color:red">Please see below summary of Covid outbreak provided by
Sohail M Qarni , MD MPH, FAAFP
Medical Director
Maryland Department of Health
Prevention and Health Promotion Administration
201 West Preston Street Room 307
Baltimore, MD 21201</span>

Here is a brief summary and recommendation  of our conversation this afternoon:
**Background:**
- Chesapeake Detention Facility (CDF) is located at 401 Madison Street, Baltimore, MD 21202
- CDF house approximately 400 inmates and 221 staff members
- It is a DPSCS facility but leswed out to the federal government
- All new arrivals to the facility are tested and quarantine for 14 days
- Any positive Covid case is moved to a different facility housing "all" positive cases
- Contact tracing is done and inmates are then quarantined and tested
- Randomized staff and inmate serial testing is being done for a "certain" percentage of the population

**Currently:**
- Has 21 positive staff members since mid-January

3

- Has 76 positive inmate cases since mid-January
- All inmate cases are located in "Quad C and F'"
- Entire C and F quad population have been tested
- Very little communication exists between other parts of the facility for both staff and inmate
- The facility/ quads are on lockdown

**Our interim guidance:**
- Will assign an outbreak to this facility
- It was felt that due to the large number of cases and high likelihood of facility wide transmission; to TEST the entire facility except for those who tested positive within the last 90 days
- Was also recommended to test exposed individuals on day 5 thru 7 unless they become symptomatic sooner
- Infectious Disease co-ordinator Mr.Emmanuel at CDF will be my contact person to follow up.
- Please refer to the following document for any further guidance

file:///C:/Users/TEMP.Owner.006/Downloads/Interim%20Guidance%20for%20Testing%20and%20Contact%20Tracing%20for%20Inmates_11102020.pdf

Please feel free to add/edit anything I may have left out or inadvertently recorded

It should go without saying that this report inspires no confidence in the jail's ability to address the crisis it is currently confronting.  Other than suggesting that detainees be tested – although the "certain" percentage of asymptomatic, unexposed detainees is wholly unspecified – the report provides no meaningful guidance about how to contain the spread of the virus.  We have seen no evidence that this "outbreak coordinator" is in fact closely engaged in addressing the outbreak at CDF.

        **A.**    **A Site Inspection Is Necessary to Uncover Accurate, Comprehensive, and Current Information About the Situation at CDF.**

For these reasons, if the Court is not immediately inclined to grant temporary release, the Court should order a site inspection of the jail to obtain accurate, comprehensive, and current information about its mitigation efforts from a neutral expert.  The Court should not permit Mr. Goforth's continued detention without assurance that he will be adequately cared for and protected

from re-infection. This request seeks information because all parties, including the Court, are at an information deficit right now. The Court's traditional practice in detention matters of proceeding through attorney proffers is not enough, amidst these unprecedented circumstances, to permit it to engage in the analysis required under the Bail Reform Act. The Court has previously recognized that proffers during detention hearings are not always sufficient; there are some matters that "require the presentation of evidence," and the COVID-19 outbreak at CDF presents one such circumstance. *See, e.g., United States v. Hammond*, 44 F. Supp. 2d 743, 746 (D. Md. 1999) (Bredar, J.).

The Court's experience with the D.C. Jail facilities should inform its approach to the present situation. At the very start of the pandemic, the government repeatedly reassured the Court, based on communications with jail officials, that pretrial detainees at the D.C. jail facilities were not at any particular risk because the D.C, Department of Corrections (DCDOC) had undertaken "comprehensive precautionary measures to protect detainees from exposure to COVID-19." *E.g. United States v. Davis*, No. ELH-20-009, Gov't Submission, ECF No. 17 (D. Md. Mar. 29, 2020). The government assured the Court that it was getting "continual updates on the situation at D.C. Jail and CTF." *Davis*, ECF No. 17, at 6 n.3.

The Court repeatedly relied upon those proffers. *See, e.g., United States v. West*, No. ELH-19-364, Order, ECF No. 23 at 3 (D. Md. Apr. 2, 2020) (Copperthite, J.); *United States v. Gray*, No. GJH-19-407, Order, ECF No. 120 (Apr. 1, 2020) (Hazel, J.) ("There is no reason for the Court to believe that the jail is not taking reasonable precautions to prevent spread within the facility nor is there reason to believe that [the defendant] would not be provided with appropriate medical care if he were unfortunate enough to join the hundreds of thousands of people who have been inflicted with the virus.").

That changed, however, when a site inspection by a neutral, court-appointed party revealed what was actually happening at those facilities. In civil litigation, Judge Kollar-Kotelly of the U.S. District Court for the District of Columbia ordered independent *amicus curiae* to enter and evaluate the D.C. Jail facilities. *See Banks v. Booth*, No. 20-cv-849 CKK, Consent Order Appointing Amici of the Court, ECF No. 34 (D.D.C. Apr. 9, 2020). The findings of the independent *amicus curiae* stood in stark contrast to the government's proffers, however well-intentioned they were. *See Banks v. Booth*, No. 20-cv-849 CKK, Memorandum Opinion, ECF No. 49 (D.D.C. Apr. 19, 2019).

Over and over, members of this Court cited to that report as the primary basis for their decisions in detention proceedings. *See, e.g., United States v. Hernandez*, No. PX-19-158, Order, ECF No. 385 (D. Md. Apr. 29, 2020) (Coulson, J.) (relying upon Banks report as basis for ordering release); *United States v. Price*, No. DKC-13-298 (D. Md. Apr. 29, 2020) (Day, J.) (relying upon Banks report as basis for ordering release); *United States v. Shaheed*, No. CCB-19-526, Memorandum Opinion, ECF No. 32, at 14 (D. Md. April 20, 2020) (Boardman, J.) ("The firsthand accounts by neutral investigators and a federal judge's preliminary finding of deliberate indifference to the risks posed by COVID-19 to the health of detainees raise serious questions about the jail's present ability to prevent the transmission of the disease.").

In at least two cases, the Court reversed earlier detention findings that were made during the pandemic after learning about the findings in *Banks*. *See United States v. Sturmer*, No. GHJ-18-468, Order, ECF No. 298, at 3 (D. Md. May 1, 2020) ("This Court rejected Ms. Sturmer's prior attempt to be released after considering the appropriate factors in the Bail Reform Act and, in some measure, taking comfort in assurances from the Government that the D.C. Department of Corrections ('DOC') was following appropriate measures to address the spread of COVID-19 inside its facilities. While the Court is absolutely certain that the assurances made by the

6

Government were made in good faith, findings made in an ongoing civil proceeding have since demonstrated that those assurances were inaccurate."); *United States v. Creek*, No. CCB-19-036, Order, ECF No. 421, at 3 (D. Md. May 1, 2020) (Blake, J.) (ordering release after earlier detention order based upon information learned about CTF from report in Banks).

In retrospect, all litigants learned that the proffers made by the government and accepted by the Court did not accurately convey the gravity of the situation in the D.C. Jail facilities and the DCDOC's failures to protect incarcerated people. The Court should not allow the same mistake to be repeated with respect to CDF. If the Court is disinclined to grant Mr. Goforth's motion based on what is so far known about the outbreak and his individualized circumstances, then more investigation is necessary in the form of a neutral, independent site inspection to uncover accurate, comprehensive, and up-to-date information through which the Court can make a fully informed decision under the Bail Reform Act.

**B.     This Court Has Legal Authority to Order a Site Inspection.**

Federal courts have inherent authority to manage their dockets. *United States v. Inman*, 483 F.2d 738, 740 (4th Cir. 1973) ("[T]he court . . . has the right to control its own docket to require that cases proceed in an orderly and timely fashion . . . ."). Indeed, Federal Rule of Criminal Procedure 57(b) expressly provides that a "judge may regulate practice in any manner consistent with federal law, these rules, and the local rules of the district." That rule recognizes that "[c]ourts have (at least in the absence of legislation to the contrary) inherent power to provide themselves with appropriate instruments required for the performance of their duties." *United States v. Ray*, 375 F.3d 980, 993 (9th Cir. 2004) (quoting *In re Peterson*, 253 U.S. 300, 312 (1920)).[2]

---

[2] Magistrate Judge Sullivan denied an earlier request for a site inspection of CDF in *United States v. Patterson*, No. 20-mj-1078-TJS, 2020 WL 2217262, at *11 (D. Md. May 7, 2020). However,

The Fourth Circuit has construed this inherent power liberally. In *United States v. Oliver*, 878 F.3d 120 (4th Cir. 2017), the Fourth Circuit said:

> It is well-settled that "[c]ourts invested with the judicial power of the United States have certain inherent authority to protect their proceedings and judgments in the course of discharging their traditional responsibilities." *Degen v. United States*, 517 U.S. 920, 823, 116 S. Ct. 1777, 135 L.Ed.2d 102 (1996). Inherent powers are those "necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *United States v. Moussaoui*, 483 F.3d 220, 236 (4th Cir. 2007) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31, 82 S. Ct. 1386, 8 L.E.2d 734 (1962)). The Supreme Court has thus recognized federal courts' inherent authority to vacate a judgment procured by fraud, *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 44, 111 S. Ct. 2123, 115 L.Ed.2d 27 (1991), to dismiss a lawsuit for failure to prosecute, *see Link*, 370 U.S. at 631-32, 82 S. Ct. 1386, to stay an action pending the outcome of parallel proceedings in another court, *see Landis v. N. Am. Co.*, 299 U.S. 248, 254, 57 S. Ct. 163, 81 L.Ed. 153 (1936), and to assess attorney's fees against counsel, *see Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765, 100 S. Ct. 2455, 65 L.Ed.2d 488 (1980), among other actions. The source of such inherent power is not a particular rule or statute but "the very nature of the court as an institution." *See United States v. Shaffer Equip. Co.*, 11 F.3d 450, 461–62 (4th Cir. 1993).

*Oliver*, 878 F.3d at 124; *Moussaoui*, 483 F.3d at 236 ("It has long been recognized that federal courts possess certain implied or inherent powers that 'are necessary to the exercise of all others.'") (quoting *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34, 3 L.Ed. 259 (1812)).

The Court's inherent powers include the authority to appoint an independent site inspector – essentially the equivalent of a special master – in criminal cases. *See First Iowa Hydro Elec. Co-Op. v. Iowa-Ill. Gas & Elec. Co.*, 245 F.2d 613, 627 (8th Cir. 1957) ("[T]he Court may, in its discretion, make appointment of a Master to assist in any of the incidents of a proceeding before

---

that order was issued more than 7 months ago, at a time when the situation at the facility was far less dire. Circumstances at this point are different: there is a confirmed outbreak and before any consideration can be given to leaving anyone in the facility, the Court must be assured based upon investigation by a neutral party that he will be safe therein. At this point, the Court is hearing only from facility staff who – as was true for DC Jail personnel – have an understandable incentive to provide a positive account of conditions within their own facility.

it, whether civil or criminal, so long as there is no infringement upon the right of trial by jury or any prejudice to other substantive right."); *Schwimmer v. United States*, 232 F.2d 855, 865 (8th Cir. 1956) ("[A] Federal District Court has 'the inherent power to supply itself with this instrument [a master] for the administration of justice when deemed by it essential.'" (quoting *Ex parte Peterson*, 253 U.S. 300, 312 (1920))).[3]

Akin to this request, courts have appointed special masters in criminal cases to perform duties similar to those sought here:

- *United States v. Konrad*, Crim. No. 11-015, 2011 WL 6739464, at *7 (E.D. Pa. Dec. 21, 2011) (appointing a special master to calculate attorney fees owed by defendant).

- *United States v. Black*, Crim. No. 16-20032, Appointment Order, ECF No. 146 (D. Kan. Oct. 11, 2016) (appointing a special master to assist in the review and removal of confidential recordings).

- *United States v. McDonnell Douglas Corp.*, Crim. No. 99-0353 (PLF), Order of Reference to Special Master, ECF No. 111 (D.D.C. July 2, 2001) (appointing a special master, *inter alia*, to review classified documents and determine whether they are discoverable under either Federal Rule of Criminal Procedure 16 or *Brady v. Maryland*).

- *United States v. Griffin*, 440 F.3d 1138, 1140-41, 45 (9th Cir. 2006) (noting a special master was appointed to review letters potentially protected by the attorney-client privilege).

- *United States v. Scaretta*, 912 F. Supp. 48, 52-53 (E.D.N.Y. 1996) (noting the appointment of a special master to safeguard money, count and store money, determine identifiable cash and property and return it to proper owners, and determine ownership of the unidentifiable funds and set up a procedure to attempt to reimburse the proper owners in a bank fraud case, and then using special master's work in determining loss amount).

---

[3] Federal Rule of Civil Procedure 53 also provides support. Civil Rule 53(b) authorizes a court to appoint a master, among other things, to "address pretrial . . . matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." Fed. R. Civ. P. 53(a)(1)(C). Where the Federal Rules of Criminal Procedure do not speak specifically to an issue, courts have drawn from practices authorized by the Federal Rules of Civil Procedure. *E.g., United States v. Fuentes-Morales*, No. 5:14-cr-00556, 2017 WL 541052, at *1 (D.S.C. Feb. 10, 2017); *United States v. Meadows*, No. 5:06-cr-00190, 2008 WL 11509240, at *2 (S.D. W. Va. June 5, 2008) (citing *United States v. Greenwood*, 974 F.2d 1449, 1468 (4th Cir. 1992)).

- *United States v. Salim*, 287 F. Supp. 2d 250, 258 (S.D.N.Y. 2003) (appointing Ph.D., M.B.A., and Professor Emeritus to act as a special master to assist in court's determination of restitution and ordering government to provide the special master with all necessary information).

- *State v. Henderson*, 27 A.3d 872, 878 (N.J. 2011) (noting the appointment of a special master "to evaluate scientific and other evidence about eyewitness identifications").

These cases demonstrate that special masters can be used to aid the Court in determining more time-intensive or complex matters involving critical determinations of fact.

The appointment of an independent person or team to perform a site inspection of CDF is appropriate in this case. In *United States v. Oliver*, the Fourth Circuit instructed that "[a] court's exercise of inherent power must be 'a reasonable response to the problems and needs that provoke it.'" 878 F.3d at 126-29. For the reasons stated above, the Court needs an independent account of what is happening at the jail, and this is the appropriate means by which to make a fully-informed and fair determination about release under the Bail Reform Act.

## CONCLUSION

For all of the reasons set forth herein and in our opening brief, we respectfully request that the Court set temporary release conditions for Mr. Goforth pursuant to § 3142(i).

> Respectfully submitted,
>
> JAMES WYDA
> Federal Public Defender
> for the District of Maryland
>
>         /s/
> _____
> NED SMOCK (#809226)
> Assistant Federal Public Defender
> 6411 Ivy Lane, Suite 710
> Greenbelt, MD 20770
> Phone: (301) 344-0600